UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

JOSEPH ELMORE,                          )
                                        )
            Plaintiff,                  )
                                        )
      v.                                )   No. 4:11 CV 217 ERW / DDN
                                        )
                                        )
MICHAEL J. ASTRUE,                      )
Commissioner of Social Security,        )
                                        )
            Defendant.                  )

**REPORT AND RECOMMENDATION**

This action is before the court for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff Joseph Elmore for supplemental security income (SSI) under Title XVI of the Social Security Act, 42 U.S.C. § 1381, et seq. The action was referred to the undersigned United States Magistrate Judge for review and a recommended disposition pursuant to 28 U.S.C. § 636(b). For the reasons set forth below, the undersigned recommends the decision of the Administrative Law Judge (ALJ) be affirmed.

**I.    BACKGROUND**

Plaintiff Joseph Elmore, who was born on September 29, 1989, was awarded SSI benefits as a child, based on disability beginning August 11, 1994. (Tr. 21.) When plaintiff turned eighteen years old, his eligibility for these benefits was redetermined under the rules of eligibility for adults. See 20 C.F.R. § 416.987. Upon redetermination, plaintiff was found not disabled as of March 1, 2008, and a Notice of Disability Cessation was issued. (Tr. 22-25.) On March 21, 2008, plaintiff filed a Request for Reconsideration of Disability Cessation before a Disability Hearing Officer, who determined that plaintiff was not disabled on May 22, 2008. (Tr. 26, 42-49.) On November 28, 2008, following a hearing, an ALJ ruled that plaintiff was no longer disabled under the Act as of March 1, 2008. (Tr. 10.) On December 17, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 7-9.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II.  ADMINISTRATIVE RECORD

In February 2000, at age 10, plaintiff was placed in the Edgewood Children's Center, an ungraded school setting, for severe behavior disorder.  While chronologically plaintiff should have been in the fourth grade, he was only doing pre-kindergarten through first grade work.  Plaintiff could not read and required constant supervision.  (Tr. 356.)

On August 2, 2000, Licensed Psychologist Thomas Davant Johns, Ph.D. administered the Wechsler Intelligence Scale test for Children-3d Edition (WISC-III) and found plaintiff's Full Scale IQ to be 75.  Dr. Johns described plaintiff as functioning within the borderline range of intelligence.  Dr. Johns diagnosed plaintiff with attention deficit hyperactivity disorder, combined type; conduct disorder, early onset type; borderline intellectual functioning; and a Global Assessment of Functioning (GAF) score of 31.[1]  (Tr. 320-21.)

In 2006, while attending Sullivan High School, plaintiff was punished with detention on September 26 for tardiness and failing to serve his detention; September 28 for truancy; October 5 for failure to serve detention; October 12 for insubordination; October 16 for truancy; October 17 for foul language; October 18 for truancy and insubordination; October 24 for failure to serve detention; October 26 for truancy, insubordination, and foul language; November 3 for excessive tardiness; November 6 for threatening to hit another student; November 7 for classroom misconduct; and on January 3, 2007, for stating that he wanted to bring a gun to school.  (Tr. 167-68.)  On October 29, 2007, plaintiff withdrew from Sullivan High School.  (Tr. 162.)

---

[1] A GAF score, short for Global Assessment of Functioning, helps summarize a patient's overall ability to function.  A GAF score has two components.  The first component covers symptom severity and the second component covers functioning.  A patient's GAF score represents the worst of the two components.
   On the GAF scale, a score from 31 to 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work).  Diagnostic and Statistical Manual of Mental Disorders 32-34 (4th ed., American Psychiatric Association 2000).

On November 3, 2006, plaintiff was admitted to the Phelps County Regional Medical Center after he told a school officer that he wanted to make a scratch on his wrist deeper. The school officer called 9-1-1 and plaintiff was subsequently admitted for suicidal ideation. Plaintiff later claimed he wanted to make a tattoo and not injure himself and that his comment was misconstrued. Upon admission, plaintiff was diagnosed with bipolar disorder and a GAF of 40 by Mohammed Choudhary, M.D. Upon discharge on November 5, 2006, plaintiff's final diagnosis was bipolar disorder and a GAF of 60.[2] At that time, plaintiff was taking Concerta, Risperdal, Remeron, and Depakote.[3] (Tr. 245-50.)

On March 21, 2007, Joseph Stroetker, O.D., saw plaintiff for a comprehensive eye exam. Dr. Stroetker noted that plaintiff's history included constant esotropia left eye and amblyopia left eye, which "mean[t] that [plaintiff's] left eye [was] turned in towards his nose all the time and it [was] a lazy eye so that even with glasses it does not see as well as his right eye." (Tr. 308.) Dr. Stroetker found that plaintiff's uncorrected vision was 20/40 in his right eye and that his vision with best correction was 20/20 in his right eye and 20/200 in his left eye. Dr. Stroetker found that plaintiff was very farsighted, needed glasses on a full-time basis, and that with glasses he had normal vision and would be able to function normally, except that he would primarily depend on his right eye for vision. (Id.)

On October 15, 2007, plaintiff's failure to participate in his Individualized Education Program and homebound school services led to their discontinuation by the Sullivan School District. (Tr. 173.)

On November 13, 2007, at age 18, plaintiff completed a Disability Report Adult form. Plaintiff reported being six feet tall, weighting 152

---

[2]On the GAF scale, a score from 51-60 represents moderate symptoms or moderate difficulty in social, occupational, or school functioning. Diagnostic and Statistical Manual of Mental Disorders 32-34.

[3]Concerta is used to treat attention deficit hyperactivity disorder by increasing the patient's ability to pay attention and to control behavioral problems. Risperidone is used to treat certain mental/mood disorders. Remeron is used to treat depression. Depakote is used to treat certain psychiatric conditions. WebMD, http://www.webmd.com/drugs (last visited December 8, 2011).

pounds, and being able to read and write more than his name in English. He stated that his ADHD, bi-polar disorder, left-eye blindness, and right-eye problems limited his ability to work. He also stated that he worked only one day before he had to quit because he could not get transportation. The heaviest weight he lifted was less than ten pounds. He added that he was attempting to re-enroll at Sullivan High School. (Tr. 132-41.)

On December 1, 2007, plaintiff's mother completed a Function Report Adult - Third Party form. She reported that plaintiff lived with her at her house. She stated that during the day, plaintiff does nothing except sits listening to music. She also stated that plaintiff's illnesses, injuries, and conditions affect his sleep, ability to care for himself, ability to remember things, and his use of money. She further stated that plaintiff is able to walk around town, where he "gets in trouble" by being rude to others. She believed that plaintiff was limited in his ability to see, remember, complete tasks, understand, concentrate, follow instructions, and get along with others, and stated that plaintiff was "one of the laziest people [she] had ever [known]." She also stated that plaintiff does not handle stress well and has needed glasses since he was a baby but refuses to wear them. (Tr. 142-50.)

On January 23, 2008, plaintiff enrolled in Pacific High School. Plaintiff was enrolled for twenty-one days but was absent for fourteen full days and three half days. (Tr. 172.)

On January 28, 2008, Licensed Psychologist Paul Rexroat, Ph.D. completed a consultative psychological evaluation report. Plaintiff was referred to Dr. Rexroat by the Jefferson City office of the Missouri Department of Social Services. Dr. Rexroat observed plaintiff was adequately dressed and groomed; not nervous, anxious, tense, or weepy; exhibited a mildly restricted rage of emotional responsiveness; and had a slightly flat affect. Dr. Rexroat also observed plaintiff had a normal energy level, was cooperative and alert, had a normal and coherent speech, and there was no evidence of flight of ideas or loosening associations or other evidence indicating a possible thought disorder. Plaintiff complained of mood swings; shakiness, rapid heartbeats, and difficulty breathing around groups of people; being occasionally and

briefly depressed with a lack of appetite; occasionally crying spells; trouble concentrating and focusing; bouts of increased energy; periods of days without sleep; irritability; and some sadness. (Tr. 433-34.)

Dr. Rexroat opined that plaintiff appeared to be functioning in the borderline range of intelligence. Dr. Rexroat found that plaintiff was able to understand and remember simple instructions, sustain concentration and persistence with simple tasks, interact socially, and perform basic activities of daily living. Dr. Rexroat diagnosed plaintiff with bipolar disorder, mixed; panic disorder without agoraphobia; attention deficit hyperactivity disorder (AHDH) by records; and a GAF of 52. (Tr. 434-36.)

On February 27, 2008, Stanley Hutson, Ph.D., completed a Mental Residual Functional Capacity (RFC) Assessment of plaintiff. Dr. Hutson found that plaintiff was moderately limited in his ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended period; perform activities within a schedule; maintain regular attendance; and be punctual within customary tolerances. Plaintiff was also moderately limited in his ability to complete a normal workday and workweek without interruption from psychologically based symptoms and in his ability to perform at a consistent pace without an unreasonable number and length of rest periods. Dr. Hutson also found that plaintiff was moderately limited in social interaction, except for his ability to ask simple questions or request assistance. Finally, Dr. Hutson found plaintiff to be moderately limited in his ability to respond appropriately to changes in the work setting and in his ability to set realistic goals or make plans independently of others. Dr. Hutson noted that treatment would improve plaintiff's coping with his mental disorders. (Tr. 437-39.)

Also on February 27, 2008, Dr. Hutson completed a Psychiatric Review Technique form. Dr. Hutson stated that plaintiff has Borderline Intellectual Functioning (BIF) by history, ADHD by history, bipolar disorder, panic disorder, and conduct disorder by history. Dr. Hutson also found that plaintiff had moderate functional limitations in the following areas: restriction of activities of daily living, difficulties

in maintaining social functioning, and difficulties in maintaining concentration, persistence, or pace. (Tr. 437-48.)

On April 15, 2008, Ruth Stoecker, M.D., completed a Physical RFC Assessment. Dr. Stoecker found that plaintiff had no exertional, manipulative, or communicative limitations but had some postural, visual, and environmental limitations. Dr. Stoecker determined plaintiff could never climb ladders, ropes, or scaffolds and that plaintiff should avoid height hazard because of his lack of binocular vision. Also, plaintiff was limited in his depth perception with his left eye, which was 20/200 with correction. Finally, Dr. Stoecker determined plaintiff should avoid all exposure to hazards, such as machinery or heights, because of his poor left eye vision. Dr. Stoecker noted and found credible that plaintiff did not report any functional restrictions due to his poor vision given that his right eye vision is 20/20 and he has normal VF.[4] (Tr. 457-61.)

On April 23, 2008, Paul Stuve, Ph.D., completed a Psychiatric Review Technique form. Dr. Stuve opined that plaintiff had a learning disability, bipolar disorder, and panic disorder. Dr. Stuve found that plaintiff had moderate functional limitations in restriction of activities of daily living and difficulties in maintaining social functioning, and mild functional limitations in difficulties in maintaining concentration, persistence, or pace. Dr. Stuve opined that overall, plaintiff was capable of performing simple work. (Tr. 462-72.)

Also on April 23, 2008, Dr. Stuve also completed a Mental RFC of plaintiff. Dr. Stuve found that plaintiff was only moderately limited in the ability to understand and remember detailed instructions, the ability to carry out detailed instructions, the ability to interact appropriately with the general public, the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to respond appropriately to changes in the work setting and the ability to set realistic goals or make plans independently of others. Dr. Stuve also noted that plaintiff can interact adequately with coworkers. (Tr. 473-75.)

On June 9, 2008, Edward Obermark, O.D., examined plaintiff. Dr.

---

[4]The record does not define "VF."

Obermark determined that plaintiff's unaided distance visual acuity is 20/40 right eye and 20/600 left eye. Plaintiff's best corrected visual acuity is 20/20 right eye and 20/400 left eye. Dr. Obermark found that plaintiff had constant left eye esoptropia, left eye amblyopia, and is far sighted with left eye greater than the right. Dr. Obermark concluded that plaintiff is legally blind in his left eye. However, with full time spectacle wear, plaintiff should be able to function well but would be dependent on his right eye. (Tr. 477.)

From June to October, 2008, plaintiff visited Roomana Arain, M.D., at Psych Care Consultants on five separate occasions. In his initial visit, plaintiff reported mood swings, anxiety attacks, crying spells, irritability, decreased sleep, depression, increased energy, restlessness, being easily distracted, poor focus, and racing thoughts. Dr. Arain diagnosed bipolar affective disorder. At intake, Dr. Arain found that plaintiff's GAF was 55. At his last appointment in October, Dr. Arain found that plaintiff's GAF was 58. Dr. Arain prescribed Depakote ER, Vistaril, Celexa, and Trazodone.[5] On June 16, 2008, plaintiff had a disheveled appearance, a depressed mood, and limited-to-fair insight and judgment. He was cooperative, coherent, fully oriented, and his thought process was intact. On June 30, 2008, plaintiff had poor and unkempt grooming, was anxious, had fair insight and judgment, was cooperative, coherent, fully oriented, and had a linear and logical thought process. On August 4, 2008, plaintiff had fair grooming, was anxious, had fair insight and judgment, was cooperative, coherent, fully oriented, and had a linear and logical thought process. On September 4, 2008, plaintiff had fair grooming, a restricted affect, was cooperative and coherent, had fair insight and judgment, and had a linear and logical thought process. On October 2, 2008, plaintiff had fair grooming, was depressed and anxious, had limited insight and a restricted affect, was coherent and cooperative, and had linear, logical thinking, appropriate behavior, and fair judgment. (Tr. 481, 483-89.)

On August 5, 2008, Dr. Arain diagnosed plaintiff with Bipolar Type

---

[5]Vistiril is used to treat anxiety. Celexa and Trazodone are used to treat depression and other mental/mood disorders. WebMD, http://www.webmd.com/drugs (last visited December 8, 2011).

II and opined that plaintiff was unable to work at that time. (Tr. 479.)

On October 2, 2008, in completing an Assessment of Ability to do Work-Related Activities (Mental), Dr. Arain stated that plaintiff had a seriously limited ability to use judgment, function independently, and understand, remember, and carry our simple job instructions. Plaintiff's ability to follow work rules and interact with supervisors was determined to be limited at the time of diagnosis. Otherwise, Dr. Arain opined that plaintiff had no useful ability to function in making personal or social adjustments, relating to co-workers, dealing with the public or work stress, concentrating and being attentive, and understanding, remembering, and carrying out complex or detailed, but not complex, job instructions. (Tr. 482.)

On October 21, 2008, the State of Missouri approved plaintiff for medical assistance benefits. (Tr. 491-92.)

**Testimony at the Hearing**

On October 31, 2008, plaintiff, a witness, Denina Wickman, and a vocational expert, Vincent Stock, appeared and testified to the following at a hearing before an ALJ.

Plaintiff testified that at the time of the hearing he was nineteen years old. He completed the eleventh grade, but dropped out of school in October 2007. He lives with his mother, father, two younger sisters, and a younger brother. He previously received disability benefits because of conduct disorders and problems. (Tr. 503-04.)

Plaintiff's anxiety and depression keep him from working. He becomes anxious around a lot of people or in small spaces. (Id.) Whenever this anxiety arises around family members, he retreats alone to his bedroom to listen to music or play his guitar. He takes medication for his anxiety, which helps. (Tr. 505.) He stopped treatment in June 2007, and did not start again until after his benefits were ceased in June 2007. That year, he spent two months in Florida with an ex-girlfriend, which is why he didn't get treatment during those months. (Tr. 506.)

During the day, plaintiff draws pictures, fishes, or plays football in his backyard with his brother. (Tr. 507.) He has trouble focusing

on tasks and becomes distracted. He had a brief period of employment and had to go to work with either his mom or dad. But, he would become anxious around his supervisors and walk out on them, which led to his terminating those jobs. (Tr. 508.) He has a hard time with authority figures and with handing stress. When under stress he goes and hides where he can be alone. Sometimes this develops into an anxiety or panic attack. His anxiety attacks become better with medication. (Tr. 509.)

Plaintiff does not follow instructions or directions well. He also has a hard time getting along with teachers. He fights with students in his school because they push him. He has a hard time handling his anger. (Tr. 510.)

When told to do household chores, plaintiff completes them only halfway, then he leaves and starts something else. He cannot read. (Tr. 511.) His difficulty following directions stems from his desire to do things the way he wants. (Tr. 512.) If he does not take his medication, he has difficulty sleeping at night. (Tr. 511.) Medication reduces his anger somewhat. (Tr. 513.)

Denina Wickman, plaintiff's mother, also testified. She testified that plaintiff constantly had problems in school, was suspended, quit school after half a day, can only go to school for an hour, has anxiety attacks, and refuses to follow directions, instructions, or do class work. Plaintiff was often angry toward his teachers, fought with other students, and "[ran] off at the mouth." (Tr. 514.)

When plaintiff returned from Florida, his mother sought treatment for him. She called Medicaid and other mental health offices, but no one accepted Medicaid. Plaintiff's two prior resources, the Family Wellness Center and the Crider Center, had lengthy waiting lists. When he returned, plaintiff complained of his depression and wanted a doctor's care. His family had difficulty getting him back in treatment. (Tr. 515.)

Plaintiff must constantly be put back on task and reminded of what he needs to do. (Tr. 516.) The more plaintiff concentrates, the more energy he has. Plaintiff is always "all over the place and into everything." While at his job, he wandered mentally and physically. He always asked and re-asked what he was supposed to do. (Tr. 517.)

Because of his poor eyesight without glasses and difficulty with math, plaintiff was denied a job, told to return to school, and had an anxiety attack. He is very withdrawn and cannot handle being forced to interact with people. In stressful situations, he would blow up and then become aggressive. If he has an anxiety attack and becomes frustrated, he becomes violent, unless he gets out of the situation. (Tr. 518.)

During the day, plaintiff "basically does nothing." He wanders the house, smashes rocks in the yard, plays football, takes apart a vehicle in the garage that he has been told not to touch, and sits at the dining table complaining of boredom. He does not follow rules when asked, nor does he go anywhere or do anything he does not feel he can handle. If someone does not accompany him out of the house, he does not leave. (Tr. 519.) He does not like his glasses and refuses to do the patching, the gels, or wear glasses. (Tr. 520.)

Vocational expert (VE) Vincent Stock also testified. In his first hypothetical question, the ALJ had the VE assume the individual was plaintiff's age and education level; had with no past relevant work; had no exertional limitations; should never climb ropes, ladders, and scaffolds; should avoid moderate exposure to unprotected heights and hazardous machinery; should not be performing any jobs requiring the use of depth perception; and was limited to simple tasks only, which require nor more than occasional contact with the public or co-workers. The VE testified that this hypothetical individual could perform work as a housekeeper or parking lot attendant, which are an unskilled jobs at the light level. (Tr. 522.)

In the second hypothetical, the ALJ had the VE assume the individual had exertional limitations; should never climb ropes, ladders, and scaffolds; could not do jobs requiring depth perception; should avoid all exposure to unprotected heights and all exposure to hazardous machinery; and could do simple tasks requiring no more than occasional contact with the public or co-workers. The VE testified that this hypothetical individual could also perform work as a housekeeper or parking lot attendant. (Tr. 523.)

In the third hypothetical, the ALJ had the VE assume the individual had the same limitations as the second hypothetical individual, except

that this individual would be limited to performing simple tasks requiring no contact with the public and no more than occasional contact with co-workers. The VE testified that this hypothetical individual could work as a housekeeper and a packer-mailer, but not as a parking lot attendant. (Tr. 523-24.)

In the fourth hypothetical, the ALJ had the VE assume the individual had the same non-exertion limitations as the third hypothetical individual but with the added condition that any job must allow for occasional disruptions of both the workday and workweek. The VE testified that these limitations would preclude employment. (Tr. 524.)

The VE also testified that if an individual has poor or no ability to relate to co-workers, deal with the public, deal with work stresses, be attentive and concentrate, and was limited in his ability to interact with supervisor and follow work rules, that individual would not be able to do the previously discussed jobs. (Tr. 525.)

### III. DECISION OF THE ALJ

On November 28, 2008, the ALJ issued a decision denying plaintiff's claim. (Tr. 10-17.) Because plaintiff was undergoing an age 18 redetermination of disability under applicable law, the ALJ did not have to make any findings under Step One of the disability determination process. (Tr. 11.)

At Step Two, the ALJ found that since March 1, 2008, plaintiff had the severe impairment of bipolar disorder. The ALJ found that while plaintiff had a medically determinable impairment of decreased corrected acuity of the left eye, this impairment was not severe. Regarding plaintiff's visual difficulties, the ALJ noted that Dr. Stroetker opined that plaintiff should be able to function normally with glasses and that Dr. Obermark opined that plaintiff should be able to function well with full time spectacle wear, and that both doctors noted that plaintiff would depend on his right eye. (Tr. 12-14.)

At Step Three, the ALJ found that plaintiff did not suffer from an impairment or combination of impairments of a severity that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (Tr. 14.)

The ALJ then found that plaintiff had the Residual Functional Capacity to perform work at all exertional levels but with the following nonexertional limitations: unable to climb ropes, ladders and scaffolding; had to avoid all exposure to industrial hazards and unprotected heights; was unable to perform jobs requiring the use of depth perception; and was limited to performing simple tasks which require no contact with the general public and no more than occasional contact with co-workers. (Tr. 15.)

The ALJ found that although plaintiff's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms, plaintiff was not credible in his statements about the intensity, persistence, and limiting effects of the symptoms, to the extent his symptoms are inconsistent with the ALJ's RFC assessment. (Tr. 15.) The ALJ found significant plaintiff's acknowledgment of his continued ability to engage in a variety of daily activities and that plaintiff did not believe his impairments were serious enough to seek any treatment until after his benefits were terminated. The ALJ also reasoned that only after plaintiff's benefits ended did he seek the assistance of Dr. Arain to write a letter on his behalf in support of continued disability benefits. The ALJ did not afford controlling weight to Dr. Arain's statement that plaintiff is unable to work, reasoning that this was not a medical opinion, but a determination to be made by the Commissioner. (Tr. 16.)

At Step Four, the ALJ found that plaintiff had no past relevant work. (Tr. 16.)

At Step Five, the ALJ determined that given plaintiff's age, education, work experience, and RFC, he was able to perform jobs existing in significant numbers in the national economy. (Tr. 16.) Accordingly, the ALJ found that plaintiff was not disabled within the meaning of the Act. (Tr. 17.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in

the record as a whole.  Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Id.  In determining whether the evidence is substantial, the court considers evidence that both supports and detracts from the Commissioner's decision.  Id.  As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently.  See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

Under the Commissioner's Regulations, individuals eligible for SSI benefits as children must have their eligibility redetermined when they become eighteen years old.  42 U.S.C. § 1382c; 20 C.F.R. § 416.987.  During this redetermination, the rules applied are those which are applicable to adults who file new applications for SSI benefits.  42 U.S.C. 1382c; 20 C.F.R. § 416.920.

To be entitled to disability benefits, a claimant must prove he is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A); Pate-Fires, 564 F.3d at 942.  A five-step regulatory framework is used to determine whether an individual qualifies for disability.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Pate-Fires, 564 F.3d at 942.

Steps One through Three require the claimant to prove (1) he is not currently engaged in substantial gainful activity, (2) he suffers from a severe impairment, and (3) his disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  However, Step One is not used for redetermining disability at age 18.  20 C.F.R. § 416.987(b).

If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to Steps Four and Five.  Id.  Step Four requires the Commissioner to consider whether the claimant retains the RFC to perform past relevant work.  Id.  The claimant bears

the burden of demonstrating he is no longer able to return to his past relevant work.  Id.  Because plaintiff had no past relevant work, the burden shifted to the Commissioner at Step Five to show the claimant retains the RFC to perform other work.  Id.

In this case, the ALJ found that although plaintiff has no past relevant work (PRW), plaintiff is able to perform jobs existing in significant numbers in the national economy.

## V. DISCUSSION

Plaintiff argues that the ALJ failed to consider all of the opinion evidence and to give it appropriate weight.  Plaintiff also argues that the ALJ failed to properly consider all of plaintiff's severe medically determinable impairments.

**A.  Opinion Evidence**

Plaintiff argues that the ALJ erred in failing to properly consider and give sufficient weight to the opinion evidence of his treating psychiatrist, Dr. Arain.  Plaintiff also argues that the ALJ erred in rejecting Dr. Arain's opinion without applying the factors in 20 C.F.R. § 416.927(d), and that the ALJ came to his own medical conclusions.

In an October 2, 2008 assessment and in an August 5, 2008 letter, Dr. Arain opined about plaintiff's work-related limitations.  (Tr. 479-82.)  Plaintiff argues that Dr. Arain's opinion--that he is unable to work and has poor to no ability to function in several work-related abilities--supports a finding that he is disabled and should be given controlling weight.

The ALJ is required to assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record.  20 C.F.R. § 416.927(d)(4).  A treating physician's opinion is generally given controlling weight, but is not inherently entitled to it.  Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); see 20 C.F.R. § 416.927(d)(2).  The opinion of a consulting physician who examines a claimant once, or not at all, generally receives very little weight.  Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000).

An ALJ may elect under certain circumstances not to give controlling weight to a treating doctor's opinion. The ALJ may credit other medical evaluations over the opinion of a treating physician, if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams v. Barnhart, 393 F.3d 798, 803 (8th Cir. 2005); Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). A physician's statement that is not supported by diagnoses based on objective evidence will not support a finding of disability. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003).

In this case, the ALJ determined that Dr. Arain's opinion did not merit controlling weight. Plaintiff visited Dr. Arain on five occasions between June and October 2008. Casey v. Astrue, 503 F.3d 687, 692 (8th Cir. 2007) (noting that the ALJ must consider the length of the treatment relationship and the frequency of examinations when weighing a treating physician's opinion). The ALJ properly observed that Dr. Arain's opinion was internally inconsistent, because Dr. Arain's conclusion that plaintiff could not work was not supported by the doctor's treatment notes. Guilliams, 393 F.3d at 803. Dr. Arain assigned plaintiff GAF scores between 55 and 58. (Tr. 481, 483, 489.) Dr. Arian's treatment notes indicate that plaintiff was fully oriented, goal-directed, cooperative, and exhibited appropriate behavior and often a linear, logical, thought process. (Tr. 483-89.) Moreover, Dr. Arain's notes only contained observations about plaintiff's appearance, mood, and prescribed medications. The notes provide no objective medical basis for a conclusion that plaintiff was disabled due to a mental or emotional impairment and was unable to work.

Furthermore, Dr. Arain's opinion that plaintiff is unable to work is inconsistent with other medical opinions in the record. Edwards v. Barnhart, 314 F.3d 964, 967 (8th Cir. 2003) (noting that the ALJ can give a treating physician's opinion less weight if it is inconsistent with or contrary to medical evidence as a whole); see also Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006); 20 C.F.R. § 416.927(d)(2). None of plaintiff's other treating or consulting physicians found that he was unable to work due to a mental or emotional impairment. It is the ALJ's

duty to resolve conflicts in the evidence.  Hacker, 459 F.3d at 936.  The ALJ was permitted to afford Dr. Arain's opinion less weight.

Although the ALJ did not afford Dr. Arain's opinion controlling weight, the ALJ did not entirely disregard Dr. Arain's opinion. Consistent with Dr. Arain's opinion, the ALJ found that plaintiff was limited to performing only simple tasks, that plaintiff could perform no job tasks requiring contact with the general public, and that plaintiff could have only occasional contact with co-workers.  (Tr. 15.)  See Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005) (recognizing that the ALJ's finding--that the claimant to be limited to sedentary work-- "reveal[ed] that the ALJ did give some credit to [the treating physician's] medical opinions").

Similarly, the ALJ's RFC determination is consistent with the medical opinions of Dr. Rexroat, who opined that plaintiff was able to understand and remember simple instructions, sustain concentration and persistence with simple tasks, interact socially, and perform basic activities of daily living.  (Tr. 433-36.)  Thus, the ALJ did not draw his own medical conclusions.

Therefore, the undersigned concludes that the ALJ did not improperly disregard or erroneously weigh Dr. Arain's opinions, nor did the ALJ improperly draw his own medical conclusions.

**B.  Severe Impairments**

Plaintiff argues that the ALJ failed to consider his borderline intellectual functioning and vision problems as severe medically determinable impairments at Step Two.  Plaintiff's argument rests upon an IQ test administered in 2000, non-exertional limitations that plaintiff presumes are a result of his vision problems, and Dr. Obermark's statement that he is blind in his left eye.

At Step Two of the evaluation process, the ALJ must determine if a claimant suffers from a severe impairment.  Kirby v. Astrue, 500 F.3d 705, 707-08 (8th Cir. 2007).  The claimant bears the burden of proving his impairment or combination of impairments is severe, but the burden is not a heavy one, and any doubt concerning whether the showing has been

made must be resolved in favor of the claimant. Id.; Dewald v. Astrue, 590 F. Supp. 2d 1184, 1199 (D.S.D. 2008).

**1. Borderline Intellectual Functioning**

Plaintiff argues that an IQ test administered to him in 2000, which revealed a full scale IQ of 75, demonstrates that he has borderline intellectual functioning and that this is a severe impairment. However, an IQ of 40 or above obtained for a child age seven or older is only current for two years after administration of the test. SSR 82-54, 1982 WL 31381, at *2 (1982). Because the IQ test was administered when plaintiff was eleven years old and because the score was over 40, the results were not "sufficiently current to permit disability evaluation." Id.

Additionally, none of plaintiff's treating physicians, aside from Dr. Davant who made the diagnosis in 2000 based upon the stale IQ test result, diagnosed plaintiff with borderline intellectual functioning. Although Dr. Rexroat opined that plaintiff appeared to be functioning in the borderline range of intelligence, he did not diagnose this as an impairment. (Tr. 434-36.)

Moreover, if a claimant does not allege any limitation in function resulting from an impairment in his application for benefits or at the hearing, the claimant waives the right to raise the claim on appeal. Anderson v. Barnhart, 344 F.3d 809, 814 (8th Cir. 2003). The ALJ is under no "'obligation to investigate a claim not presented at the time of the application for benefits and not offered at the hearing as a basis for disability.'" Pena v. Chater, 76 F.3d 906, 909 (8th Cir. 1996) (citation omitted).

In his Adult Disability Report, plaintiff did not allege any functional limitations due to borderline intellectual functioning, nor did plaintiff make such allegation at the hearing. (Tr. 133.) Thus, the ALJ was under no duty to explore and evaluate whether it was a severe impairment of plaintiff.

Therefore, the ALJ did not err in failing to find that plaintiff had a severe mental impairment of borderline intellectual functioning.

### 2. Vision

Plaintiff also argues that the ALJ erred in finding that his vision problems were not a severe impairment.

While there is evidence in the record that plaintiff had limited vision in his left eye, there is also evidence that his limited vision would not significantly limit his ability to do basic work activities. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007) (noting that an impairment is not severe if it amounts to only slight abnormality and does not significantly limit the claimant's physical or mental ability to do basic work activities); 20 C.F.R. § 416.921(a). Basic work activities concern the abilities and aptitudes necessary to perform most jobs. 20 C.F.R. § 416.921(b). Examples of basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) using of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. Id.

The record includes the opinions of two optometrists. Dr. Stroetker found that with glasses plaintiff would have normal vision and should be able to function normally, except that he would primarily depend on his right eye. (Tr. 308.) Dr. Obermark concluded that, though plaintiff is legally blind in his left eye, "with full time spectacle wear he should be able to function well" despite being dependent on his right eye. (Tr. 477.) Both opinions support the ALJ's finding that plaintiff's vision problems were not a severe impairment.

Moreover, the ALJ included functional limitations based on plaintiff's vision problems in his RFC. In his RFC determination, the ALJ found plaintiff was precluded from climbing ropes, ladders or scaffolding; that plaintiff had to avoid all exposure to industrial hazards and unprotected heights; and that plaintiff was unable to perform work tasks requiring depth perception. (Tr. 15.) Thus, although the ALJ found plaintiff's visual problems to be non-severe, he properly included limitations arising from plaintiff's visual problems in plaintiff's RFC. See SSR 96-8p, 1996 WL 374184, at *5 (1996) ("In assessing RFC, the

adjudicator must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not "severe.").

Because the ALJ considered the functional limitations, any error by the ALJ in not determining plaintiff's visual problems to be a severe impairment does not require remand. <u>Swartz v. Barnhart</u>, 188 F. App'x 361, 368 (6th Cir. 2006) (holding ALJ's failure to classify impairment as severe was harmless, because the ALJ included limitations from the impairment in the RFC); <u>Valley v. Astrue</u>, No. 4:10CV01393 JTR, 2011 WL 5999260, at *2 (E.D. Ark. Nov. 29, 2011) (same).

### VI.  CONCLUSION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have until close of business on March 19, 2012 to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.

<u>     /S/   David D. Noce     </u>
**UNITED STATES MAGISTRATE JUDGE**

Signed on March 5, 2012.